**VECINOS De BARRIO UNO, et al.**

v.

**CITY OF HOLYOKE, et al.**

**Civil Action No. 92–30052–MAP.**

United States District Court, D. Massachusetts.

May 23, 1996.

Daniel J. Gleason, Julie A. Trachten, Nutter, McClennen & Fish, Boston, MA, David P. Hoose, Alan M. Katz, Katz, Sasson & Hoose, Springfield, MA, William Newman, Lesser, Newman, Souweine & Nasser, Northampton, MA, Ozell Hudson, Jr., Lawyers' Committee for Civil Rights, Boston, MA, Alan J. Rom, Law Office of Sherwin L. Kantrovitz, P.C., Boston, MA, for Plaintiffs.

Edward R. Mitnick, Asst. City Solicitor, Kenneth J. Cote, Jr., City of Holyoke Law Department, Holyoke, MA, Steven P. Perlmutter, Robinson & Cole, Boston, MA, for Defendants.

Thomas E. Kanwit, United States Attorney's Office, Boston, MA, for Movant.

### MEMORANDUM AND ORDER

PONSOR, District Judge.

### I. INTRODUCTION

On March 27, 1995, this court issued its decision in this voting rights case, holding that the electoral system for at-large positions on the Holyoke City Council violated the Voting Rights Act of 1982. *Vecinos De Barrio Uno v. City of Holyoke,* 880 F.Supp. 911 (D.Mass.1995). On December 29, 1995, the First Circuit Court of Appeals remanded the case for a more detailed explication of the reasons supporting the court's decision. *Ve-*

*cinos De Barrio Uno v. City of Holyoke,* 72 F.3d 973, 989 (1st. Cir.1995).

Following remand and issuance of a scheduling order to govern further proceedings, counsel for both parties requested an informal stay to permit discussions regarding possible settlement. When it became clear that settlement, at least at that stage, would not be possible, the court adopted a revised schedule for submissions addressing at least three questions. First, what issues, legal and factual, did the Court of Appeals, in counsel's view, instruct this court to address, or suggest that this court might address, in its opinion remanding this case? Second, what, in counsel's view, is the proper response with regard to each of these issues? Third, what future proceedings, if any, are necessary in order to permit the presentation of evidence on any relevant issue? *See* Order of February 13, 1996 (Docket No. 142).

The court has now received counsel's written submissions, their replies to each other's submissions, a written proffer from the plaintiffs regarding purported new evidence on the current Hispanic voting age population of Holyoke and defendants' motion to strike this written proffer.

The purpose of this memorandum is to set the context for further proceedings and to establish a time schedule. I will begin with a description of the background of this case and a summary of my understanding of the First Circuit's directive.

## II. *BACKGROUND*

■ The district court's decision of March 1995 began with the description of the legal standards to be applied, focusing particularly on the three threshold conditions established in the Supreme Court's *Thornburg v. Gingles* decision, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). These are: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group is "politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50–51, 106 S.Ct. at 2765–66. Although each side quotes from the extensive case law construing the Voting

Rights Act and *Gingles,* selecting and pressing those quotations with the most favorable spin, no fundamental disagreement exists with regard to the legal standards to be applied here.

This court then proceeded to examine the historical background of the case, the economic and social conditions of the Hispanic community in Holyoke, the City's election history since 1983 and the impact of evidence regarding turnout and minority cohesion. The court concluded that the evidence presented by plaintiffs was sufficient to satisfy all three of the *Gingles* threshold criteria. 880 F.Supp. at 925. The court found unpersuasive the defendants' argument that Hispanic lack of success in at-large City Council elections could be explained by factors other than the at-large system itself, finding that "it is difficult to imagine any Hispanic candidate, no matter how attractive and no matter how effective at bringing out the Hispanic vote, having a fair opportunity to win in any at-large election in Holyoke during this period." *Id.* at 926. The court also examined the totality of the circumstances and found that it favored the plaintiffs, thus buttressing the inference created by the plaintiffs' satisfaction of the *Gingles* criteria. *Id.* at 927.

In its review of this decision on appeal, the First Circuit began with a description of the background and a summary of the applicable law. This review of the law essentially paralleled the summary set forth in this court's original decision, with one important difference. In examining the totality of the circumstances, Judge Selya stated that the court might well consider "other factors, apart from racial bias, that may have caused the white bloc voting identified in the third *Gingles* precondition." 72 F.3d at 980 (footnote omitted). The Court of Appeals interpreted the Supreme Court's decision in *Johnson v. De Grandy,* —— U.S. ——, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994), as indicating that "plaintiffs cannot prevail on a VRA § 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus." 72 F.3d at 981. The reason for this is that "when racial antagonism is not the cause of an electoral defeat suffered by a minority candi-

date, the defeat does not prove a lack of electoral opportunity but a lack of whatever else it takes to be successful in politics...." *Id.*

Except to a limited extent, the trial of this case—at this court's explicit urging—largely avoided exploration of evidence tending to show racial antagonism in Holyoke, or to put it differently, evidence of (in the words of the First Circuit) "a community riven along racial lines." *Id.* This was done for two reasons.

First, counsel assumed that evidence of general racial hostility would essentially be irrelevant to any issue other than intent. Since the 1982 amendments to the Voting Rights Act installed the "results" test as the standard, no litigant has needed to show intent in order to prevail in a Voting Rights case. Therefore, this issue was not pursued.

Second, and perhaps more importantly, both counsel and the court were sensitive to the potentially disruptive effect that adversarial proceedings on the subject of racial tension might have on the community itself. It was no one's intent to put the people of Holyoke, either Hispanic or non-Hispanic white, on trial. Many individuals of many backgrounds work together within the community, which is now emerging, it is hoped, from a period of difficult economic and social stress. Thus the trial was structured, to the extent possible, to respect the primary tenet of medicine: first, do no harm. As a result, only limited evidence of general racial animus, focusing mainly on the election of 1987 and on electoral practices, was introduced.

If the question of racial antagonism now needs to be explored explicitly, given the First Circuit's clarification of the standard, then perhaps both plaintiffs and defendants should be given an opportunity to do this on remand.

Following clarification of the standard, the Court of Appeals' decision proceeded to reject three threshold arguments made by the defendants. First, as to the contention that the failure to prove any one *Gingles* precondition in any one election eliminated that election from judicial consideration, the Court of Appeals concluded that "the court

below had every right to analyze all the elections (suspect and non-suspect)" in its decision. *Id.,* at 985. Second, the opinion rejected the City's argument that the plaintiffs could not satisfy the preconditions because Hispanics as a group are insufficient to constitute a majority in any wards other than Wards 1 and 2. Third, and perhaps most importantly, the Court of Appeals approved this court's finding that Hispanic voter turnout, though sometimes small, was adequate to reflect political cohesion in the Hispanic community. 72 F.3d at 987.

The Court of Appeals then turned to the primary difficulty that in its view rendered this court's opinion unclear. Judge Selya observed that the trial court had analyzed fifteen elections in which Hispanic candidates ran for office. Four of these were at-large elections and the rest were ward elections for either City Council or School Committee seats. He put aside four of the eleven ward elections, on the ground that in these Hispanic candidates ran unopposed and that therefore these elections "reveal little about either minority cohesion or white bloc voting." *Id.* at 988 (footnote omitted). In seven of the remaining eleven at-large and ward elections, the Court of Appeals suggested, neither minority cohesion behind Hispanic candidates nor racially polarized voting appeared to have been found.

Judge Selya then stated as follows:

Viewed from a different angle, the court's finding that so few elections exhibited telltale signs of minority cohesion and/or white bloc voting seems to be tantamount to a finding that those characteristics were absent from approximately two-thirds of the analyzed elections. The finding also seems to contradict the district court's conclusion that the plaintiffs established the second and third *Gingles* preconditions. Of course, it is possible that the apparent contradiction can be explained away: we recognize that determining whether racial bloc voting exists is not merely an arithmetic exercise that consists of toting up columns of numbers, and nothing more. To the contrary, the district court should not confine itself to raw numbers, but must make a practical, commonsense assay of all

the evidence. But allowing for the possibility of a sophisticated evaluative judgment does not dissipate the need to explain that judgment.

*Id.* at 989 (citations omitted).

The Court of Appeals concluded that it could not accept this court's conclusions "without a better articulated rationale." *Id.*

In addition to requesting more detail regarding the district court's reasoning on this point, the Court of Appeals suggested that four other issues might be proper topics for further discussion.

First, the court noted the apparent "rise in the Hispanic community's political fortunes." Given this, the Court of Appeals requested that the court "explain more fully its view that vote dilution persists in spite of improved political conditions." *Id.* at 990. In making this request, Judge Selya emphasized that the trial court must determine whether the challenged electoral structure deprives Holyoke's Hispanic community of a fair opportunity "to participate in the political process *at present.*" *Id.* (emphasis in original).

Second, the Court of Appeals asked this court to explain why and how the evidence from the ward elections "inform the analysis of what had transpired in contests for at-large seats on the City Council." *Id.*

Third, the Court of Appeals requested that the district court meet "head-on" the City's contention that Ward 4 constitutes an influence district and therefore "should be taken into account in evaluating whether Hispanic voting strength has been illegally diluted." *Id.*

Fourth, the Court of Appeals stated that on remand this court need not simply discuss the evidence identified as troubling but would be "free to reopen the record, to take additional evidence and/or to reconsider all (or any part) of its findings in light of the comments contained in this opinion." *Id.* at 992. In this regard, the Court of Appeals suggested that this court might wish to consider

evidence gleaned from the new round of recent municipal elections.

Finally, the Court of Appeals invited this court to reconsider its remedy order, deferring in the first instance to the defendants' choice among legally permissible remedies.[1]

## III. *DISCUSSION*

As noted above, following receipt of the decision, the court afforded counsel an opportunity to discuss settlement, after which memoranda were submitted on the topics specified above. With due respect to counsel, the submissions, though lengthy and well written, are less helpful than had been hoped. Defendants expend a large portion of their argument suggesting that the practical effect of the First Circuit's remand order is that this court should enter immediate judgment for the defendants, on the ground that the *Gingles* criteria were not and cannot be satisfied. This is neither a fair nor reasonable construction of Judge Selya's opinion. The plaintiffs' submission seems to suggest, with as much delicacy as possible, that the First Circuit has got its facts wrong and that this court should simply take corrective action to put them on the right track.

In fact, the nature of the court's task on remand is both simpler and more complicated than counsel's memoranda seem to recognize. The simple part has to do with clarifying the language and logic of the original opinion, which has led to understandable puzzlement on the part of the Court of Appeals. The more complex part has to do with the nature of further proceedings needed to address the somewhat expanded field of inquiry Judge Selya's opinion lays out.

Turning first to the simpler part, it was certainly never the court's intention to suggest that its findings with regard to the elections were tantamount to a holding that Hispanic voter cohesion and white bloc voting were absent from roughly two-thirds of the elections examined. The Court of Appeals' concern on this point is well placed.

1. As it happened, before entering judgment following the original trial in this case, the court *did* give the City an opportunity to submit its own proposed remedial plan. *See* 880 F.Supp. at 928. The City, however, taking the view that

the court was incorrect in its assessment of liability, declined to propose any plan that would have realistically addressed the problem of Hispanic vote dilution.

The problem, however, is not with the *evidence* presented, but with the confusing way this court discussed that evidence, while (as Judge Selya noted) juggling several issues at once.

■ Minority voter cohesion and white bloc voting were present in virtually every single election analyzed between 1983 and 1993. The testimony of plaintiffs' expert, Dr. Alan Lichtman, established this fact, in the court's view, beyond reasonable dispute. With one exception, candidates preferred by Hispanic voters ranked at or near the bottom of the order of preference for non-Hispanic white voters over the ten-year period. As the court attempted to state, other factors in specific elections may have *outweighed* white bloc voting as explanations for the results. In other words, white bloc voting was not always outcome determinative. Santiago–Garcia's recent arrival to Holyoke may have been more important in the 1989 election in explaining her loss, and Rodriguez–Ortiz' unpopularity generally may explain his poor showing in the at-large elections in 1991 and 1993. Nevertheless, *both* these candidates ranked at or near the top in the preferences of Hispanic voters and at the bottom in the preferences of non-Hispanic whites. To say that white bloc voting was probably not determinative in some elections is not the same as saying it was absent.

Moreover, four of the six elections in four of the six election years scrutinized featured contests between Hispanic and non-Hispanic candidates (two at-large and two in wards) where Hispanic vote dilution *was* outcome determinative. Put differently, in *every* race where the court could make a fair evaluation of the real impact of white bloc voting, it operated to shut out Hispanic candidates.

This was the court's intended meaning in its original decision. In accordance with the First Circuit's directive, I stand ready to reconsider and reevaluate that conclusion on remand. Counsel will be permitted to make further submissions to buttress or reverse that holding using the schedule set forth below.

With regard to the harder part of the court's task, the expanded field of inquiry, some specification of the outline of the work to be done is needed. Counsel should assume they will be asked to make supplemental submissions on the following issues. First, does "racial antagonism" exist within the City of Holyoke and to what extent does this antagonism play a part in the electoral process? Second, has the Hispanic community recently enjoyed a rise in its political fortunes and, if so, what does this say about the persistence of vote dilution, if any, in Holyoke? Third, how and why does the evidence from ward elections inform the analysis of what transpires in contests for at-large seats, if at all? Fourth, what conclusions should be drawn from the population proportions in Ward 4 and the possible characterization of this ward as an "influence district"? Fifth, what conclusions can be drawn from the 1995 elections? Sixth, what conclusions may be drawn, if any, from races where Hispanic candidates run unopposed, if the evidence of blank ballots is disregarded? Finally, what is the evidence with regard to the *present* proportion of Hispanics within the overall population and the voting age population of Holyoke? Exploration of this issue is particularly important in view of Judge Selya's emphasis on the question of whether the challenged electoral structure deprives a racial minority of equal opportunity to participate in the political process *at present*. Counsel will have until August 9, 1996 to complete all discovery on these issues and will appear again before this court on August 21, 1996 at 2:30 p.m. for a pre-hearing conference to establish a timetable for presentation of evidence and submission of supplemental proposed findings of fact and conclusions of law.

It is So Ordered.